JOHN FOWLER & CO. (LEEDS), LTD., *v.* R. CATTON AND G. W. MACFARLANE.

APPEAL FROM CIRCUIT JUDGE, FIRST CIRCUIT.

ARGUED JANUARY 5, 1905.        DECIDED MARCH 27, 1905.

FREAR, C.J., AND CIRCUIT JUDGES ROBINSON AND MATTHEW-MAN IN PLACE OF HARTWELL AND HATCH, JJ.

ACCOUNTING—*denied on the evidence.*

> An accounting sought by a principal as to storage charges and rates of commissions charged by an agent is denied,—the evidence, particularly statements of accounts and letters when in conflict with oral testimony adduced by the principal, showing that no more had been charged than was proper.

Id.—*when commissions paid to each of two alleged co-agents.*

> One claiming to be sole agent charged commissions on orders
> secured by an alleged co-agent at the rate usually charged on
> orders sent through others than the agent. After he had ceased
> being agent, and had sent his statement of accounts to the prin-
> cipal showing these charges, the principal paid the alleged co-
> agent certain special commissions on these orders. Held, the
> principal was not entitled to recover from the agent the commis-
> sions so charged by him.

### OPINION OF THE COURT BY FREAR, C.J.

This is a suit in equity for an accounting brought by a for-
eign corporation, having its principal office in London and
its manufacturing works in Leeds, England, as principal,
against the defendants as its agents in the Hawaiian Islands.
The circumstances out of which it arose are similar to those
out of which the case of *Macfarlane v. Catton,* decided this
day, arose.

The defendant Macfarlane did not answer but more than
two years after the suit was instituted filed a cross bill against
his co-defendant, which cross bill was dismissed, rightly as
we think, by the circuit judge on the same ground on which
his direct bill against Catton was dismissed in the suit just
referred to. No further attention need be paid to this. In
neither suit do Fowler & Co. and Macfarlane seem to be an-
tagonistic to each other.

The plaintiff practically seeks relief from the defendant
Catton alone, and that particularly for the period beginning
January 1, 1894, and ending February 28, 1899, during which
Catton claimed to act as sole agent for the plaintiff in these
islands. The plaintiff alleges that this defendant at the de-
termination of the agency on the last mentioned date had in
his possession a large quantity of unsold goods and withheld
upwards of $13,000 received from sales of goods and refused
to account for the same. Catton sets up in his answer that he
was sole agent during the period in question, that he had ac-
counted for all moneys and property which came into his

hands as such agent and that the account had been closed. The evidence in the case of Macfarlane against Catton was made a part of this case and much further testimony and many exhibits were introduced but with the result that the circuit judge dismissed the plaintiff's bill as against the defendant Catton, holding that the evidence showed that the latter had fully accounted for all moneys and property that had come into his hands.

The plaintiff appealing now contends that the evidence shows that there are at least some matters in respect of which the defendant should be required to account. It seems to be practically conceded that Catton had accounted for all of the property that had come into his hands. At least, no effort was made to support the allegations in regard to the property or to contradict the evidence which showed that the property had been fully accounted for, and no question is now raised on this appeal as to the property. The only matters as to which it is contended that Catton should account are: (1) charges made for rent of warehouse or storage; (2) overcharges in the rates of commissions; and (3) commissions charged and withheld by Catton on orders obtained by Macfarlane during the period when Catton claimed to be sole agent.

Before considering these matters it may be well to set forth briefly the nature of the agency and the changes that took place in it from time to time. In 1880 the plaintiff, a manufacturer of steam plows and other machinery, appointed Macfarlane and one W. L. Green, then co-partners in Honolulu, its agents in these islands to take orders for and sell machinery, collect moneys due for machinery and remit the same to the principal after deducting commissions, etc. Originally the commission was 5 per cent. on orders taken by the agents, called direct orders, and on sales of machinery consigned to the agents for sale. A few years later a commission of 2 1-2 per cent. was allowed on orders, called indirect orders, sent by customers, particularly through houses in England and Germany, to the principal directly, that is, not through the

agents. Green and Macfarlane. dissolved partnership in 1882 or 1883, but Green retained his interest in the agency until 1889. About 1883 Catton entered the employment of Macfarlane on a salary and 1 per cent. commission on the sales of machinery. About the same time Macfarlane, apparently because he was sharing commissions with both Green and Catton, arranged with the plaintiff to allow a further commission of 2 1-2 per cent. on sales of machinery consigned for sale. In 1889 Green retired from the agency and the plaintiff appointed Macfarlane and Catton its joint agents. About the same time the commissions were increased on direct and indirect orders respectively to 7 1-2 and 5 per cent. Macfarlane and Catton at first divided the commissions between themselves in the proportion of 3 to 2 and later 2 to 3 respectively. In 1893 Catton took the position that after the end of that year he would no longer act except as sole agent, and he acted on that theory from that time until the end of February, 1899, when he withdrew and Macfarlane was appointed sole agent. The reason for Catton's taking this position appears to have been Macfarlane's financial embarrassment, which began some time before 1889 and continued until some time after 1894, probably until the latter part of 1897, and in regard to which the plaintiff as well as Catton felt considerable uneasiness. There is, of course, dispute as to some of these matters. The appointment of the agents, the fixing of rates of commission and the changes in these from time to time do not seem to have been made in a formal way. They are shown by oral testimony as to conversations and understandings, the conduct of the parties, statements of accounts, allusions or claims in letters, etc., etc. There seems to have been more or less carelessness of statement or forgetfulness on the part of some of the witnesses. There is much conflict in the testimony and as a rule the letters are vague and unsatisfactory. There is even much inconsistency between letters written by the same person at different times, as if the writer had forgotten what had taken place or been written previously.

The matter of the charge for rent of warehouse or storage of goods consigned for sale is of comparatively minor importance. R. H. Fowler of the plaintiff company testified in substance that no arrangements were ever made for the allowance of rent; that rent had to be paid out of commissions; that the commissions were to cover all expenses of the agency; that Macfarlane had cared for the goods without charge; that if such a charge had been made it would not have been passed by the company; that he was not aware that any charges for storage had been made before the first "rent" charge, and that if any were made they were liquidated out of commissions. But he must have been mistaken, for both Macfarlane and Catton testify that prior to 1889 the plaintiff paid for the storage of consigned goods, and this seems to be corroborated by copies of the "accounts sales." Catton testifies further that an iron warehouse came out from Glasgow in 1889, which was set up and used for the storing of plaintiff's goods and the goods of Mirrlees, Watson & Co., for whom also the defendants were agents, and that he estimated that, considering the cost of the building, the ground rent and other charges, $800 a year would be a proper charge for the whole building, or $100 a quarter for the half used by the plaintiff, that charge taking the place of charges made previously for storage and certain other expenses, and that he explained this to Alfred Fowler when the latter was in Honolulu in 1890, and that he (Fowler) was perfectly satisfied. Apparently the warehouse belonged to Mirrlees, Watson & Co., and the rent was collected for their account. Several letters written in 1890 tend to confirm Catton's testimony on these points. The charge of $100 a quarter was made in the accounts until 1895, when in March the plaintiff objected that it was too high and asked for a "modification," at the same time stating that it had never agreed to the charge. Two months later, in May, 1905, the plaintiff passed the account of April 1, 1905, containing an item of $100 for rent of warehouse. Catton, in consequence of the plaintiff's objection to the charge of $100, then re-

duced the charge to $75 a quarter, and in March, 1898, the rent was further reduced to $50, apparently in consequence of a letter from the plaintiff dated September 3, 1897, in which attention was called to the fact that $100 had been charged to June, 1895, and $75 thereafter. In that letter the plaintiff stated that it had never agreed to pay $100 and that it expected an allowance of the difference between $100 and $75 for the period during which the higher rate had been charged, and that the plaintiff was willing to allow the charge of $75 to stand but was not willing to continue paying that rate, and concluded, "anyhow we will not continue to pay so much as we have been doing and you must kindly do the needful to alter the present arrangement." Thus the plaintiff's contention as to storage charges prior to 1889 are wholly unsustained; the statement of Catton as to the arrangement made with Alfred Fowler in regard to $100 a quarter is uncontradicted; the charges of $100, $75 and $50 a quarter successively were passed by the plaintiff for years, and there is practically nothing but the statement of the plaintiff in the letters of 1895 and 1897 that it had never agreed to the charge of $100, and no insistence was made then or at any subsequent time until the filing of this suit that a credit should be given for the difference between $100 and $75 for the period when the larger amount was charged.

In regard to the rates of commission, no effort has been made to show that the rate on stock sales was less than $7\frac{1}{2}$ per cent. As to the rate on direct orders, R. H. Fowler testified that it had never been increased beyond 5 per cent. and that no more than 5 per cent. had ever been agreed for such orders, but the evidence, including invoices prepared by the plaintiff itself, showing allowances of 7 1-2 per cent. commissions on such orders is so overwhelmingly against the testimony of Mr. Fowler that it is now conceded that he was mistaken upon this point. As to commissions on indirect orders, R. H. Fowler testified that the plaintiff arranged to allow 2 1-2 per cent. when possible and when the prices would permit it

and took the position that no more than that was ever allowable on such orders. Macfarlane testified that the rate was not uniform on such orders, but was 2 1-2 per cent. in some instances, 5 per cent. in others and 7 1-2 per cent. in others, according to the price obtained, although he finally admitted that the agents charged 5 per cent. and without objection on the part of the plaintiff until 1895, when they stated objections to Macfarlane in London, but that he (Macfarlane) did not advise Catton of these objections. Catton testifies that the rate on indirect orders was increased to 5 per cent. as well as that on direct orders to 7 1-2 per cent. upon Macfarlane's return from England in 1889, and that after discussing the matter with Alfred Fowler in 1900 the latter told him (Catton) to go on as he had been doing in the matter of commissions, which was, as the quarterly accounts showed, to charge 5 per cent. on indirect orders and 7 1-2 per cent. in other cases. Catton testifies also that the plaintiff endeavored to make the rate arbitrary on its part for each order but that he (Catton) would not stand it; also that there were but two exceptions, so far as he can remember, in the charges at these rates, both of which are explained by special circumstances, one being on a direct order and the other on an indirect order, for each of which the commission was 2 1-2 per cent. The other exceptions relied upon by the plaintiff, in which charges of 1, 2 and 2 1-2 per cent. respectively were made, were apparently cases of commissions charged for dividends collected for the plaintiff and not commissions on sales, or divisions of commission between the co-agents and not charges as between the principal and the agents. There seems to be no valid ground for distinction between the commissions on direct orders and those on indirect orders so far as their uniformity and recognition by both parties are concerned. Very likely the plaintiff might rightfully have fixed a special rate on any indirect order in advance as it did on one or two occasions, but, even if it could have fixed the rate in each instance after the order had been secured and notice thereof had been given to Catton but

before it had passed the rate charged by Catton, it would not follow that it could arbitrarily fix the rates or disallow them altogether years afterwards and after the close of the agency, nor does the plaintiff pretend .that it had fixed any rates differently from those charged in Catton's various statements of account. If the question were merely one of reasonable rates to be determined by the court on all the evidence, a rate of 5 per cent, that is, the rate usually acquiesced in by the parties, would doubtless be considered reasonable.

Lastly, as to commissions charged by Catton on orders obtained by Macfarlane during the period when Catton claimed to be sole agent. It seems that during the latter part of this period, beginning perhaps about the end of 1897, Macfarlane obtained a number of orders for the plaintiff. Among these were four orders obtained in the latter part of 1898 and early part of 1899 shortly after the annexation of these islands to the United States, when there was a special impetus in business here, particularly in the starting of new plantations, and a special desire to procure steam plows and other machinery before the extension of the Federal tariff laws to the islands. Catton was kept informed by the plaintiff as to these four orders and before leaving the agency charged commissions upon them at the rate of 5 per cent. on the theory that he was sole agent at that time and entitled to commissions at that rate upon indirect orders sent through Macfarlane as well as through other channels. The commissions on these orders amounted to $6,678.65. The plaintiff's contention is that commissions upon these orders were paid to Macfarlane as one of the two supposed co-agents and that Catton should now account for the sum charged by him on the same orders. It is unnecessary to decide whether Catton and Macfarlane were co-agents or not during the period in question, although this was one of the leading issues in the case and one to which a large portion of the evidence was directed, for if a co-agency did exist at that time the orders in question were direct orders, and Catton, with whom alone the plaintiff had dealt in con-

nection with the agency ever since 1893 so far as the accounts were concerned, would have been entitled, quite as much as Macfarlane, to charge or retain the commissions, and not only the commissions that he did charge, at the rate of 5 per cent., but commissions at the rate of 7 1-2 per cent., and the plaintiff did not pay Macfarlane his commissions on these orders or arrange for their payment to him until a year or so after Catton had charged the commissions and sent his statement of account to that effect to the plaintiff. Further, these commissions, whatever they amounted to, which is not clear, were allowed Macfarlane in the shape of spares held in stock in Honolulu and were special commissions allowed him as a matter of private arrangement with the plaintiff in consideration of special expenses incurred and services performed in connection with these orders. Under such circumstances the plaintiff ought not to be allowed to require Catton to refund the commissions received by him. In view of this conclusion, we prefer not to go into the question as to whether Catton was sole agent or not during the period in dispute. That question could not be treated satisfactorily except at considerable length, because of the great amount and conflict of evidence, and whatever conclusion we might have come to on this point if we had heard the case originally, it is at least very doubtful if we could under the circumstances, especially in view of the conflict and vagueness in the evidence, disturb the findings of the judge who did hear the case originally.

The decree appealed from is affirmed.

*Robertson & Wilder* for plaintiff.

*Holmes & Stanley* and *Kinney, McClanahan & Cooper* for defendant Catton.

No appearance for Macfarlane.